IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

OSHAY RANDOLPH,

                Plaintiff,                        OPINION AND ORDER

v.

                                              21-cv-108-wmc

CINDY BUCHANAN and MARTHA MASCIOPINTO,

                Defendants.

---

*Pro se* plaintiff and state prisoner Oshay Randolph claims that a doctor and health services manager at Columbia Correction Institution ("CCI") violated his federal constitutional and state law rights by failing to provide him adequate medical care for his torn Achilles tendon. Before the court are defendants' motions for summary judgment on all of Randolph's claims. Even viewing the evidence in a light most favorable to Randolph, Randolph has failed to submit sufficient evidence from which a reasonable jury could find either defendant violated his constitutional rights or engaged in medical negligence. Accordingly, the court will grant defendants' motions for summary judgment.

UNDISPUTED FACTS[1]

Plaintiff Oshay Randolph was incarcerated at CCI during all times relevant to this case. Defendant Cindy Buchanan was the manager of the Health Services Unit ("HSU") at CCI, and defendant Martha Masciopinto, a physician, provided primary care to inmates there.

---

[1] The following facts are drawn from the parties' proposed findings of facts and responses, and are undisputed except where noted. All facts are drawn in the light most favorable to the plaintiff, as the nonmoving party.

On January 15, 2020, Randolph saw Dr. Masciopinto for several health concerns, including bilateral ankle pain. Upon examination, Randolph exhibited pain in his left ankle. Masciopinto ordered an x-ray of both his ankles and prescribed physical therapy. Randolph was already receiving Flexeril for back pain and Lidocaine cream for another condition, which Masciopinto stated might also help with his ankle pain. She did not prescribe any specific pain medication for Randolph's ankles.

Approximately two weeks later, on January 30, Randolph injured his left ankle while playing basketball during recreation. That same day, Dr. Masciopinto received a referral for primary care from a nurse regarding the injury and an appointment was scheduled. In the interim, Masciopinto placed orders for an ace wrap and ice therapy, and she recommended that Randolph protect, rest, compress and elevate his left ankle.

Randolph then saw Dr. Masciopinto on February 5, 2020. Randolph described hearing a pop after landing on his foot while playing basketball. He also reported that he had been applying ice, staying off his feet and taking Meloxicam, but that he was not getting relief. Upon examination, Masciopinto noted that Randolph's left Achilles tendon had no definition, and that Randolph was having difficulty walking. She ordered a "stat" x-ray of the left ankle and an ultrasound to check for a partial or total Achilles tendon rupture, noting that an MRI might be necessary depending on the results of the x-ray and ultrasound. She also ordered a Toradol injection for Randolph's left ankle pain. The x-ray showed no bone or soft tissue abnormalities. The ultrasound, however, showed "thickening of Achilles tendon most compatible with chronic tendinosis/interstitial chronic tear," and the radiologist recommended consideration of an "MRI if concern for an acute tear." (Dkt. #27-1, at 15.)

2

On February 12, 2020, Randolph next saw the prison physical therapist, who noted that Dr. Masciopinto "feels [the injury] may be a torn or partially torn achilles." (Dkt. #27-1, at 14.) That same day, Dr. Masciopinto ordered a second injection of Toradol for Randolph's left ankle pain. In addition, Randolph received a "sidekick low profile walking boot," which he was to wear continuously for 60 days to immobilize and control his ankle movement, protect his foot from absorbing shock, allow minimal weight bearing while walking, and permit his tendon to heal.

On February 16, Randolph submitted a health service request ("HSR"), complaining of worsening Achilles tendon pain. On February 18, Randolph also told nursing staff that pain was now radiating from his ankle to his posterior thigh and left groin. Concerned about possible deep vein thrombosis, nursing staff next sent Randolph to the hospital, where any thrombosis was ruled out and his pain subsided somewhat. Between February 27 and March 12, 2020, however, Randolph submitted several follow-up HSRs, requesting to be seen for left leg pain and reporting that he could not sleep and needed pain medication.

On February 24, Dr. Masciopinto ordered a third Toradol injection for Randolph, then saw Randolph for an in-person appointment on March 12, which was approximately six weeks after his suspected Achilles tendon injury. At that time, Randolph was still experiencing pain, as well as struggling with mobility and range of motion. Masciopinto ordered an MRI and another Toradol injection. She also submitted another order for Tramadol.

An MRI of Randolph's left Achilles tendon was performed on March 17, showing a full thickness tear of Randolph's Achilles left tendon. (Dkt. #27-1, at 9.) For reasons not

explained in the record, however, the hospital did not send HSU or Dr. Masciopinto the MRI report as was standard procedure. As a result, Masciopinto did not even realize the report was missing until she was preparing to see Randolph for a follow-up appointment on April 14, 2020. She then contacted the hospital immediately to ask for the report to be faxed that same day.

In the meantime, Randolph had submitted five HSRs on March 24, 2020, asking about pain medication and complaining about his leg pain and inability to walk. He submitted additional HSRs on March 25, 26 and April 5, 6, and 8. Nursing staff responded to these HSRs by advising that he was scheduled to be seen in HSU soon by an advance medical provider.

On April 14, Randolph saw Dr. Masciopinto again. After discussing the MRI results, Masciopinto explained that: not all Achilles tendon injuries require surgical intervention to heal; and because local hospitals were only providing emergency procedures due to Covid-19 policies, he might not get surgery. Nevertheless, Masciopinto assured Randolph that she would discuss the best treatment approach with DOC's orthopedic physician, Dr. O'Brien.

The following day, Masciopinto responded to one of the HSRs that Randolph submitted regarding pain, stating that "after our appointment yesterday 4/14/20, I need to review the meaning of a 10/10 pain. This is the worst pain you can imagine – [you] wouldn't be able to walk around, or smile or laugh because the pain would be debilitating. We'll go ahead with the injection today but not go forward from there." (Dkt. #27-1, at 22.) In another note dated that same day, Masciopinto approved an order for Amitriptyline, an extra pillow, lower bunk and ice bag for Randolph, but also wrote to

4

advise Randolph that his "presentation to staff on med pass and in the clinic is not consistent with a pain level of 10, and that she did not "know why you continue to insist that you're having the worst pain ever but look as cool as a cucumber and your vital signs are inconsistent with a pain level of 10 as well." (*Id.* at 18.)   Masciopinto further advised Randolph that she would continue to try to contact any orthopedic doctors she could reach during the ongoing Covid-19 pandemic.

Randolph then responded to Dr. Masciopinto's April 15 messages, by assuring that he was not "pulling [her] leg when I say I am in pain!" and that "this is the most pain" he had ever experienced, but that he was "a happy person no matter what." (*Id.* at 17.)  In response, Masciopinto commended Randolph's "excellent attitude," but noted that there were other objective indicators that would be present if he was actually experiencing "10/10 pain." (*Id.*)

At some point, Randolph's walking boot was taken away, apparently by security staff, although there is no explanation in the medical records or the parties' submissions as to why.  On April 28, Dr. Masciopinto ordered another boot for Randolph.  Masciopinto also wrote to Randolph that she was looking into why his boot had recently been taken, but that per Dr. O'Brien, he needed to wear his walking boot at all times.  She also reported that the local hospital was just beginning to see elective, non-emergency patients as of May 4, 2020.

On May 11, Dr. Masciopinto wrote to Randolph again, explaining that she would be speaking about Randolph's Achilles tendon with the DOC Committee that approves surgeries, and she would recommend working with different orthopedic groups due to ongoing Covid-19 restrictions at CCI and neighboring hospitals.  Masciopinto further

5

informed Randolph that she would be discontinuing further Toradol injections because such injections should not be necessary to manage pain this long after the Achilles tendon rupture per Dr. O'Brien.

On May 15, Dr. Masciopinto next responded to an interview information request from Randolph regarding the discontinuation of the Toradol injections, stating that the treatment decision was based on Dr. O'Brien's experience dealing with many cases of Achilles tendon ruptures, along with all the research on the normal course of a ruptured Achilles tendon. (Dkt. #33-19.) In particular, Masciopinto emphasized that Dr. O'Brien and she were not suggesting that Randolph was not in pain, but rather that he was not behaving like someone having constant 10/10 pain. (*Id.*)

On May 18, Randolph was approved for an off-site consult with an orthopedic surgeon. Dr. Masciopinto wrote to Randolph on May 20, informing him that he had an upcoming appointment with a surgeon for his Achilles tendon and noting that she had asked security staff to find out why Randolph's walking boot had been taken away. Also on May 20, nursing staff noted in Randolph's medical records that HSU Manager Buchanan had been notified about Randolph's missing boot, and that she would direct Randolph to contact his unit manager about the boot. (Dkt. #48-1, at 1.) Because Randolph's original boot had not been returned, and he had not yet received the boot that Masciopinto had ordered on April 28, she placed a high-priority order for another walking boot on June 1 as well.

On May 26, Randolph saw Dr. James Self, the off-site, health care provider. Dr. Self discussed treatment options with Randolph, including being seen at UW Orthopedics in Madison for evaluation. While Randolph wanted to proceed with a potential surgical

6

intervention, however, he was required to complete a quarantine under then Covid-19 protocols, after returning from his off-site appointment and before being seen at the UW Orthopedic Clinic. Thus, he did not see Dr. Masciopinto again until June 23, 2020. At that appointment, Masciopinto discussed his treatment options, then referred him to UW Orthopedics.

On June 29, 2020, Randolph was seen by Dr. Kevin Sandhu at the UW Orthopedic Clinic. However, Dr. Sandhu recommended that Randolph continue *non*-operative treatment for his Achilles tendon tear and begin physical therapy, preferrable two to three times per week. Dr. Masciopinto approved Sandhu's recommendation of physical therapy, further recommending that Randolph receive the maximum therapy available. Following his off-site visit to UW-Orthopedic, however, Randolph was then quarantined for 14 days, which delayed his starting physical therapy. After this quarantine, Randolph began physical therapy just once per week, which was the maximum frequency allowed at CCI at the time, again based on Covid-19 policies and staff availability.

On July 4, 2020, Dr. Masciopinto also responded to an interview/information request from Randolph, who reported starting a hunger strike to protest his not getting proper help from HSU regarding his pain. In noting his hunger strike, Masciopinto stated that at his recent appointment with a urologist, Randolph had received a diagnosis of a non- painful condition, despite his continuing insistence that he was in pain. Randolph continued to submit HSRs complaining of pain in July and August 2020, with Masciopinto ordering additional Meloxicam in response to one of the requests. According to physical therapy records submitted by Randolph, he received another walking boot at some point

in June or July 2020, and his physical therapy was improving his gait. (Dkt. #48-1, at 15–16.)

OPINION

Plaintiff is proceeding on Eighth Amendment and state law claims against both defendants Buchanan and Masciopinto. The Eighth Amendment to the U.S. Constitution prohibits cruel and unusual punishment. In the medical context, the Supreme Court has interpreted that to mean that prison staff may not be "deliberately indifferent" to a prisoner's "serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). "Deliberate indifference" means that the defendant is aware of an excessive risk to the prisoner's health or safety, but the defendant is disregarding the risk by consciously failing to take steps to help the prisoner. Perez v. Fenoglio, 792 F.3d 768, 777 (7th Cir. 2015).

In the medical context, deliberate indifference may be inferred when the defendant's conduct is "blatantly inappropriate," *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996), or "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). In other words, "[a] constitutional violation exists only if no minimally competent professional would have so responded under those circumstances." *Johnson v. Dominguez*, 5 F.4th 818, 825 (7th Cir. 2021) (internal quotations omitted)). Stated in simpler terms, a plaintiff asserting a medical-care claim under the Eighth Amendment must prove four

things: (1) the prisoner needed medical treatment; (2) the defendant knew that the prisoner needed medical treatment; (3) the defendant consciously refused to take reasonable steps to provide the needed treatment; and (4) the defendant's action or inaction harmed the plaintiff. Federal Civil Jury Instructions of the Seventh Circuit § 7.17 (2017); *Hunter v. Mueske*, 73 F.4th 561, 565 (7th Cir. 2023).

Wisconsin law defines medical negligence as the failure of a medical professional to "exercise that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or similar circumstances." *Sawyer v. Midelfort*, 227 Wis.2d 124, 149, 595 N.W.2d 423, 435 (1999); *Schuster v. Altenberg*, 144 Wis. 2d 223, 229, 424 N.W.2d 159, 161–62 (1988). A negligence claim has four elements: (1) a breach of (2) a duty owed (3) that results in (4) harm to the plaintiff. *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860. Thus, the plaintiff must show that: (1) defendant failed to use the required degree of skill exercised by an average medical professional in the defendant's field; (2) the plaintiff was harmed; and (3) there is a causal connection between the defendant's failure and the plaintiff's harm. Wis. JI–Civil 1023.

Both defendants move for summary judgment on plaintiff's claims against them. On a motion for summary judgment, the question is whether there are any genuine factual disputes that could make a difference to the outcome of the case, or stated another way, whether a reasonable jury could find for the nonmoving party after drawing all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 314–15 (7th Cir. 2011); *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). The court will examine this question with respect to the evidence of record against each defendant separately.

I.  **Defendant Cindy Buchanan**

During the relevant time period, defendant Buchanan was the HSU manager and provided no direct medical care to plaintiff. Plaintiff's contention that Buchanan was involved in his care is based on two pieces of evidence: (1) a May 20, 2020 nursing record, noting that Buchanan had been notified about plaintiff's missing walking boot, and directed plaintiff to contact his unit manager about the boot (dkt. #48-1, at 1); and (2) an August 4, 2020 HSR that plaintiff directed to Buchanan about his pain (dkt. #48-1, at 17.). However, this alleged involvement by Buchanan is not sufficient to prove that she acted with deliberate indifference or negligence to plaintiff's Achilles tendon tear. As for the nursing note regarding plaintiff's boot in particular, no reasonable jury could conclude that Buchanan's directing plaintiff to consult with his unit manager violated his Eighth Amendment or state law rights, particularly since she was never Randolph's principal care provider. Moreover, at the time of the nursing note, Dr. Masciopinto was already treating plaintiff's condition, security staff had already been directed to find the missing boot, Masciopinto had ordered a second boot, and within a few days, Masciopinto placed a high priority order for a third boot. The evidence with respect to the August 2020 HSR is even less persuasive. In fact, plaintiff has submitted *no* evidence that Buchanan ever saw or received that HSR. Rather, another nurse responded to the HSR accurately advising plaintiff that he was scheduled to be seen. So, plaintiff's claims fail against Buchanan.

II.  **Defendant Martha Masciopinto**

As the physician who evaluated and provided direct care to plaintiff for his Achilles tendon injury, Dr. Masciopinto played a significant role plaintiff's medical care. She was

the physician primarily responsible for prescribing pain medication and other treatment for plaintiff's Achilles tendon injury, as well as ordering imaging and requesting appointments with specialists. For purposes of summary judgment, Masciopinto concedes that: plaintiff's torn Achilles tendon and associated pain were objectively serious medication conditions *and* she was aware of his serious medical needs. However, Masciopinto disputes that she failed to properly treat plaintiff's serious medical needs, much less acted with negligence or deliberate indifference by knowingly disregarding "'an excessive risk to [his] health or safety.'" *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (quoting *Farmer*, 511 U.S. at 837).

As an initial matter, plaintiff concedes that Masciopinto saw him and provided him *some* care, but argues that she provided him with inadequate care under the circumstances. Because Masciopinto provided plaintiff with some treatment, the relevant question under the Eighth Amendment is whether her actions were "such a substantial departure from accepted professional judgment, practice, or standard, as to demonstrate that [she] actually did not base the decision on such a judgment." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996). The relevant question for state law negligence is: whether Masciopinto's actions fell below the relevant standard of care for a primary care physician treating an Achilles tendon injury.

Fundamentally, Masciopinto argues that plaintiff's claims fail because there is no reasonable dispute on this record that she exercised professional judgment in deciding how to treat plaintiff. The court agrees with defendant and concludes that plaintiff has failed to submit evidence from which a reasonably jury could conclude that Masciopinto failed to use medical judgment or fell below the standard of care in making treatment decisions.

11

Specifically, the medical records themselves show that between January 30, 2020 and July 14, 2020, Dr. Masciopinto: had four, in-person appointments with plaintiff; submitted numerous orders for ice, bandages, a low-bunk restriction, cam walker boots, pillows, Toradol injections and oral pain medications for his ankle pain; referred plaintiff to physical therapy; consulted with an orthopedic physician; and referred plaintiff to an outside orthopedic specialist.  All of these undisputed actions preclude a reasonable jury finding Masciopinto acted with deliberate indifference toward plaintiff's injury, but instead show that Masciopinto provided numerous interventions to help plaintiff.

Nonetheless, plaintiff identifies in his complaint several, specific treatment decisions by Dr. Masciopinto that amounted to deliberate indifference.  First, he complains that because Masciopinto suspected an Achilles tendon tear during his first appointment, she should have arranged for him to see a specialist or obtain an MRI or surgery for his Achilles tendon sooner.  However, he has submitted no evidence from which a reasonable jury could find that: an MRI was necessary sooner; surgery was the only acceptable way to treat his injury; or the initial, nonoperative treatment chosen by Masciopinto was "so far afield of accepted professional standards as to raise the inference that is was not actually based on a medical judgment."  *Norfleet*, 439 F.3d at 396.  Nor has plaintiff presented evidence that Masciopinto unreasonably delayed referring plaintiff to an outside specialist or orthopedic surgeon.

Unfortunately, plaintiff's injury happened near the beginning of the Covid-19 pandemic, when severe restrictions were implemented at hospitals and medical centers generally.  As a result, plaintiff's ultimate appointment was only scheduled according to availability *after* plaintiff's injury did not appear to be improving from non-invasive

12

measures.  Regardless, neither outside specialist who evaluated plaintiff recommended surgery for plaintiff; instead, they suggested the same physical therapy as a reasonable, nonoperative approach to treatment, just as had Dr. Masciopinto.

Second, plaintiff contends that Dr. Masciopinto failed to provide him promptly with a new cam walker boot, despite knowing that it was missing and that he could not walk or properly heal without it.  Again, however, plaintiff has submitted no evidence suggesting that Masciopinto was responsible for taking plaintiff's walking boot, nor for tracking it down.  Regardless, the record shows that Masciopinto contacted security staff and entered two new orders for boots to rectify the problem.  These actions do not amount to deliberate indifference or negligence.

Third, plaintiff contends that Masciopinto should have provided physical therapy more frequently, as recommended by the outside orthopedist.  However, Masciopinto *did* request that plaintiff be given physical therapy as frequently as possible, but unfortunately it was available only once per week because of staffing and Covid-19 policies through no fault of Masciopinto.

Fourth, and finally, plaintiff contends that Masciopinto persisted in ineffective treatment by continuing to prescribe him ineffective pain medications and refusing to continue Toradol injections, which at least helped alleviate his pain somewhat.  However, the Eighth Amendment does *not* give a prisoner a right to specific treatment or a medical provider on demand.  *Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016).  Here, the evidence shows that Masciopinto submitted ten different orders for pain medication to plaintiff between February and July 2020, including prescriptions for tramadol, Flexeril, meloxicam, lidocaine and amitriptyline, along with Toradol injections. While she

13

eventually stopped the Toradol injections on the advice of the prison orthopedic physician, Dr. O'Brien, plaintiff has submitted no evidence suggesting that Masciopinto's treatment decisions were inappropriate under the circumstances.

In sum, the extensive treatment record recounted above shows that Masciopinto did not disregard plaintiff's medical needs. As a result, no reasonable jury could conclude that Masciopinto acted with deliberate indifference to plaintiff's Achilles tendon injury or related medical problems. Accordingly, Masciopinto is entitled to summary judgment on plaintiff's Eighth Amendment medical care claims. For the same reasons, Masciopinto is entitled to summary judgment on plaintiff's state law negligence claim, as plaintiff has submitted no evidence from which a reasonable jury could conclude that Masciopinto's treatment decisions fell below the standard of care for a primary care provider.

## ORDER

IT IS ORDERED that:

1. The motions for summary judgment filed by defendant Cindy Buchanan (dkt. #25) and defendant Martha Masciopinto (dkt. #30) are GRANTED.

2. The clerk of court is directed to enter final judgment for defendants and close this case.

Entered this 11th day of January, 2024.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge